UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
        v.                              )        Criminal Action No. 99-0043 (PLF)
                                        )
  JOSE MARQUEZ,                         )
                                        )
            Defendant.                  )
_____)

OPINION

        This matter is before the Court on defendant Jose Marquez's claim that he

received ineffective assistance of counsel at trial.  After a two-month-long trial in 2000, Mr.

Marquez was convicted of conspiracy to distribute narcotics and acquitted of two other charges

of possession with intent to distribute narcotics.  Following his conviction, Mr. Marquez filed a

motion for a new trial on the ground that his trial counsel was ineffective.  The Court granted the

motion on August 3, 2001, see United States v. Marquez, Opinion, Criminal No. 99-0043, Dkt.

No. 516 (D.D.C. Aug. 3, 2001) ("Marquez I"), and the government appealed.  The court of

appeals reversed this Court on procedural grounds.  See United States v. Marquez, 291 F. 3d 23

(D.C. Cir. 2003).  On remand, after extensive briefing on sentencing issues, the Court sentenced

the defendant to 72 months in prison, but permitted him to remain on bond pending appeal.

        Mr. Marquez directly appealed his conviction, again raising an ineffective

assistance of counsel claim.  The court of appeals remanded the case for an evidentiary hearing to

permit this Court to determine the adequacy of Mr. Marquez's representation after hearing

testimony from his trial counsel.  See United States v. Marquez, No. 05-2112 (D.C. Cir. May 2,

2006).  Upon consideration of the testimony at the evidentiary hearing, the arguments of the

parties in their briefs and in open court, and the entire record in this case, the Court again

concludes that Mr. Marquez's counsel was ineffective and therefore that Mr. Marquez should be

afforded a new trial.

## I. PROCEDURAL HISTORY

Defendant Jose Marquez originally was indicted along with six others on March

2, 1999.  The government charged him in three counts of a nine-count indictment, specifically

with:  (1) conspiracy to distribute cocaine, cocaine base and heroin, in violation of 21 U.S.C.

§ 846; (2) unlawful possession with intent to distribute 100 grams or more of heroin and aiding

and abetting, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(i) and 18 U.S.C. § 2; and

(3) unlawful possession with intent to distribute heroin within 1000 feet of a school and aiding

and abetting, in violation of 21 U.S.C. § 860(a) and 18 U.S.C. § 2.  Beginning on March 6, 2000,

Mr. Marquez stood trial with two co-defendants and alleged co-conspirators, Pedro Agramonte

and Jose Diplan.[1]

The two possession counts against Mr. Marquez arose out of a series of events on

February 4, 1999, when DEA agents observed Mr. Marquez leave the El Pacifico pool hall along

with Mr. Agramonte and Mr. Diplan.  At trial, the agents testified that they saw Mr. Marquez get

into a blue Oldsmobile that they knew had been used earlier that day to transport heroin and drive

it a short distance -- from the pool hall to an alley behind an apartment building.  At the

apartment building, Mr. Agramonte and Mr. Diplan had allegedly cut and packaged the heroin

---

[1]      Co-defendants Roger Ramirez, Jose Ismael Medina-Torres, and Miguel Romero
all pled guilty and testified at the trial in this case.

that had been hidden in the car.  When he left the car, Mr. Marquez threw the car keys in the grass next to the apartment building.  DEA agents then arrested him.

With respect to the conspiracy count, the evidence against Mr. Marquez consisted primarily of the testimony of two alleged co-conspirators who had pled guilty and had become witnesses for the government: Bertilio Jesus Soto Canales and Jose Ismael Medina-Torres.  Mr. Soto Canales's testimony concerned conversations between Mr. Marquez and Henri Alberto, one of the alleged leaders of the narcotics distribution conspiracy.  At various times, Mr. Soto Canales testified that he either heard these conversations directly or that they were related to him by Mr. Alberto.  Mr. Medina-Torres testified to discussions that he had with Mr. Marquez in which -- according to Mr. Medina-Torres -- Mr. Marquez offered to sell him powder cocaine and revealed that the drugs for sale belonged to Henri Alberto.  Mr. Medina-Torres's testimony also concerned debriefings he had with the FBI and the DEA in which he discussed his conversations with Mr. Marquez.

On May 3, 2000, the jury found Mr. Marquez guilty of the conspiracy charge but acquitted him on the two substantive counts.  Following the trial, Mr. Marquez moved for an extension of time to file a motion for a new trial based on ineffective assistance of counsel.  The Court sought new counsel to represent Mr. Marquez on his motion.  In the interim, the Court failed to rule on the motion for extension of time within the seven-day period then required by Rule 33 of the Federal Rules of Criminal Procedure.  On August 3, 2001, the Court issued a lengthy opinion granting Mr. Marquez's motion for a new trial.  That opinion is included as an appendix to this Opinion and, except where otherwise noted, the findings and conclusions in Part III of that Opinion are incorporated by reference.  See Marquez I at 12-50.

3

On appeal, the court of appeals dismissed the case on jurisdictional grounds, holding that this Court had forfeited its authority to grant the new trial motion when it failed to rule on Mr. Marquez's motion for an extension of time to file within the seven-day period specified by Rule 33 of the Federal Rules of Criminal Procedure.  See United States v. Marquez, 291 F.3d 23, 27-29 (D.C. Cir. 2002).   The court of appeals suggested that Mr. Marquez pursue his ineffective assistance claim by collaterally attacking his conviction or by directly appealing it. See id. at 29.  After the court of appeals' decision, this Court entered a judgment of conviction and imposed a sentence of 72 months.  Mr. Marquez directly appealed his conviction.  The second time around, the court of appeals considered the merits of the case.  See United States v. Marquez, No. 05-2112 (D.C. Cir. May 2, 2006).  The court concluded, however, that based on the trial record alone it was unable to determine whether Mr. Marquez had received ineffective assistance of counsel.  See id.  The court remanded the record to this Court for an evidentiary hearing to determine whether Mr. Marquez's counsel was ineffective as defined by the two-part test set out in Strickland v. Washington, 466 U.S. 668 (1984).  See id.  On remand, this Court heard testimony from Mr. Marquez's trial counsel to assist it in determining whether her representation of Mr. Marquez at trial met the Strickland test.

The evidentiary hearing only confirmed for the Court what it had concluded immediately after the trial in this case: Mr. Marquez's trial counsel was woefully inadequate. She had no sufficient explanation, based on strategic or tactical reasons, or otherwise, for her deficient and damaging performance.  The Court stands by its initial finding that counsel was ineffective, the rationale for which is more fully explained in its original opinion granting Mr. Marquez's new trial motion.  See Marquez I at 12-50.

4

II. GOVERNING LAW

The Sixth Amendment guarantees a criminal defendant the effective assistance of

counsel.  See Strickland v. Washington, 466 U.S. at 686.  Under the familiar two-prong

Strickland test, a defendant claiming ineffective assistance of counsel must show: (1) that

counsel's performance was "deficient," that is, that it fell below an objective standard of

reasonableness "under prevailing professional norms"; and (2) that the deficient performance

prejudiced the defense.  Id. at 687-88.  This requires showing that the defense counsel's errors

"were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. at

687.  Recognizing the wide range of sound trial strategy that a constitutionally effective attorney

might choose, the Supreme Court has put the burden on the defendant to overcome the

presumption that trial counsel's performance "falls within the wide range of reasonable

professional assistance."  Id. at 689.  The defendant must show that counsel's alleged errors were

not the result of sound trial strategy.  See id.

In judging counsel's performance under Strickland, the question is not whether "a

particular act or omission" was unreasonable, but whether "in light of all the circumstances, the

identified acts or omissions were outside the wide range of professionally competent assistance."

Strickland v. Washington, 466 U.S. at 689-90.  In other words, a court must consider the

cumulative effect of counsel's errors.  See Lindstadt v. Keane, 239 F.3d 191, 202 (2nd Cir. 2001)

(holding that although some of the errors counsel made would not alone reach constitutional

ineffectiveness, "the cumulative weight of error convinces this Court that the ineffectiveness of

counsel reached the constitutional threshold."); Henry v. Scully, 78 F.3d 51, 53 (2nd Cir. 1996)

(concluding that the court need not determine whether one or two of counsel's errors amounted

5

to ineffective assistance because the "aggregate effect of these three instances of inaction by defense counsel convinces us that the magistrate and district judge were correct in finding" ineffective assistance of counsel).

As to the second prong of the Strickland test, prejudice, the defendant must show a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland v. Washington, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. As the court of appeals has emphasized, "Strickland requires *reasonable probability*, not certainty." United States v. Gaviria, 116 F. 3d 1498, 1514 (D.C. Cir. 1997) (emphasis in original); see also United States v. Williams, 358 F.3d 956, 926 (D.C. Cir. 2004) (defendant "need *not* show that his attorney's performance 'more likely than not' altered the outcome of the case") (quoting Strickland v. Washington, 466 U.S. at 693) (emphasis in original)). In making this determination, the trial court must consider the "totality of the evidence" and whether counsel's errors "have had a pervasive effect on the inferences to be drawn from the evidence" that "alter[s] the entire evidentiary picture . . . ." Strickland v. Washington, 466 U.S. at 695-96.

The court of appeals concluded that because the trial record alone usually does not reflect whether counsel's alleged errors are supported by sound trial strategy or whether they were prejudicial, it was appropriate to remand the record for an evidentiary hearing to this Court, "'the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial.'" United States v. Marquez, No. 05-2112 at 2 (quoting Massaro v. United States, 538 U.S. 500, 505 (2003)). In Massaro, the Supreme Court recognized that when evaluating an ineffective assistance of counsel claim, deference should be paid to the

trial court judge who, "having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial." Id. at 506; see also United States v. Williams, 358 F.3d at 962 (holding that after an evidentiary hearing, "[i]f the District Court finds that [the defendant] received ineffective assistance of counsel, [the defendant] must be afforded a new trial").

## III.  THE TRIAL

The trial in this case took eight weeks and the government called 42 witnesses to testify in its case-in-chief.  Yet, the government introduced very little evidence against Mr. Marquez, and almost all of it related to the events of February 4, 1999, when Mr. Marquez drove a blue Oldsmobile some hours after an aborted drug sale in which he was not involved.  Indeed, a description of that incident was virtually the only mention of Mr. Marquez in the government's detailed opening statement.  See 3/6/00 Tr. at 107-12.[2]  In his opening statement, the prosecutor mentioned numerous individuals and events both in the District of Columbia and in Philadelphia leading up to February 4, 1999, but he only mentioned Mr. Marquez once (as a friend of Mr. Agramonte's) prior to describing the events of February 4, 1999.  See 3/6/00 Tr. at 117-22, 126. Even when describing the testimony the government would offer through the two key witnesses against Mr. Marquez, the prosecutor never mentioned Mr. Marquez.

During the course of the trial, several DEA agents testified about Mr. Marquez's activities on February 4, 1999, but neither they nor anyone else testified that Mr. Marquez did anything with respect to the aborted drug sale except to drive the blue Oldsmobile from the El

---

[2]      The transcripts of the March-April 2000 trial in this case will be referred to by date and page with the abbreviation "Tr."

Pacifico pool hall to an alley near an apartment building several hours after the transaction was called off by alleged co-conspirator Pedro Agramonte.  The government's case against Mr. Marquez on the two substantive counts arising from these events was thin, and so it was not surprising that the jury acquitted him on both of those counts.

In the Court's view, the evidence introduced by the government against Mr. Marquez on the conspiracy charge in its case-in-chief was even thinner; in fact, it was virtually nonexistent.  The conspiracy purportedly lasted from the spring of 1998 until early February 1999.[3]  Over the first several weeks of trial the government introduced detailed testimony describing the activities of alleged co-conspirators Roger Ramirez, Henri Alberto, Antonio Alberto, Jose Ismael Medina-Torres, Juan Zavala, Bertilio Soto Canales, Miguel Romero and Pedro Agramonte in the many drug transactions conducted over the course of the alleged conspiracy.  The jury viewed numerous video tapes depicting seven drug transactions that took place during that period, involving Roger Ramirez and Jose Ismael Medina-Torres -- two of the government's primary witnesses.  No one testified that Mr. Marquez was involved in any of these drug sales, including the sale on February 4, 1999, or in any of the trips taken by Henri Alberto, Antonio Alberto, Pedro Agramonte and Jose Ismael Medina-Torres to Philadelphia to transport kilogram quantities of drugs back to Washington, D.C.  Despite all of the evidence presented regarding these drug sales and the conspiracy of which they were a part, Mr. Marquez was never implicated in these events by any of his alleged co-conspirators or by any other witness.  For weeks on end, Mr. Marquez simply was not mentioned in the trial of this case.

---

[3]     The indictment alleged that the conspiracy did not end until February 9, 1999 because defendant Antonio Alberto was not arrested until that day, but Mr. Marquez was arrested on February 4, the day of the final, aborted drug transaction.

The only testimony to implicate Mr. Marquez in the conspiracy came from two of the alleged co-conspirators, government witnesses Bertilio Jesus Soto Canales and Jose Ismael Medina-Torres.  Yet, on direct examination, even their testimony did not establish Mr. Marquez's participation in the conspiracy.  Both testified about isolated events: Mr. Soto Canales testified about a single drug transaction which he did not personally witness, and Mr. Medina-Torres described two conversations in which Mr. Marquez offered to sell drugs belonging to Henri Alberto; yet no drugs or money changed hands.  In fact, neither of the witnesses testified that they ever personally saw Mr. Marquez with any type of drug.  In addition, their accounts of Mr. Marquez's activities were vague and often confusing.  This evidence barely implicated Mr. Marquez in any sort of illegal activity and did little to support an inference that Mr. Marquez was a member of the charged conspiracy.

### A. Cross-Examination of Government Witness Bertilio Jesus Soto Canales[4]

Bertilio Jesus Soto Canales spent most of his two days on the witness stand testifying about his drug activities with Henri Alberto, Antonio Alberto, Pedro Agramonte, Roger Ramirez and Jose Ismael Medina-Torres.  Near the end of his direct testimony, he testified that he knew Mr. Marquez, having met him at the El Pacifico pool hall located next door to the grocery store run by Mr. Marquez's mother-in-law.  See 3/21/00 Tr. at 1410.  During the government's direct examination of Mr. Soto Canales, there were two statements admitted in evidence regarding Mr. Marquez's alleged involvement in the charged drug conspiracy: (1) a statement allegedly made to Mr. Soto Canales by Henri Alberto in which Mr. Alberto allegedly

---

[4]       The Court's earlier Opinion discusses in some detail the cross-examination of Mr. Soto Canales.  See Marquez I at 12-24.

9

told Soto Canales that Mr. Marquez had come to Mr. Alberto's apartment to get drugs (the statement in the apartment), and (2) Mr. Soto Canales's grand jury testimony in which he testified that he actually witnessed Henri Alberto give drugs to Mr. Marquez in the apartment. Mr. Soto Canales recanted the grand jury testimony at trial.  As described in greater detail in Marquez I, Mr. Marquez argues that trial counsel's errors in dealing with these statements allowed a third, much more damaging, statement to be admitted, specifically that Mr. Soto Canales claimed at one time to have personally heard Mr. Marquez ask Mr. Alberto for drugs and claimed that in response Mr. Alberto told Marquez to come to the apartment in about an hour. This third statement allegedly was made on the street outside the El Pacifico pool hall.  See Marquez I at 12-23.

        At one point during the trial, the prosecutor proffered that he thought that Mr. Soto Canales would testify that he actually saw Henri Alberto give Mr. Marquez drugs.  See 3/21/00 Tr. at 1412-13.  Defense counsel responded that she was unaware of any such testimony, that "[t]his is totally new" to her, and that she was "totally taken . . . by surprise." Id. at 1413. The prosecutor promptly pointed out that Mr. Soto Canales had testified before the grand jury that he saw Mr. Alberto give Mr. Marquez drugs in the apartment. Id. at 1413-14.  Defense counsel responded:  "I have the grand jury transcript, and I don't recall seeing that in the grand jury transcript that Henri gave Marquez drugs." Id. at 1414.  When the prosecutor showed defense counsel the grand jury testimony, she acknowledged the accuracy of the prosecutor's proffer, explaining that she simply had missed that portion of the grand jury transcript.  See id. at 1414-15 ("I didn't see that.  I'm sorry.  I didn't see that.  I only saw the previous page and I didn't see that.").

10

In the presence of the jury, the prosecutor read a portion of Mr. Soto Canales's grand jury testimony in which Mr. Soto Canales testified that he had witnessed Henri Alberto give drugs to Mr. Marquez in the apartment.  See 3/21/00 Tr. at 1425-27.  Mr. Soto Canales conceded that he had so testified in the grand jury, but he then recanted his grand jury testimony. See id. at 1426-27.  He explained that Mr. Marquez had come to Mr. Alberto's apartment, that Mr. Marquez and Mr. Alberto had gone into another room where Mr. Soto Canales could not see or hear them and that after Mr. Marquez left Mr. Alberto had told Mr. Soto Canales that he had given Mr. Marquez drugs.  See id.  Mr. Soto Canales had not actually seen any drug transaction. See id.  Trial counsel then objected to Mr. Soto Canales' recantation as hearsay (which it was) even though this hearsay testimony, explaining away his grand jury testimony, was helpful to her client.  See id. at 1427.

Although defense counsel's objection and her motion to strike the "hearsay" statement in the apartment may have seemed reasonable to counsel at first, the Court explained outside the presence of the jury that the statement probably helped the defendant more than the government because it directly contradicted the witness's inculpatory grand jury testimony.  See 3/21/00 Tr. at 1452-55.  If the jury was going to be permitted to consider Mr. Soto Canales's grand jury testimony as substantive evidence anyway under the Federal Rules of Evidence ("I saw Mr. Alberto give Mr. Marquez drugs," see id. at 1426-27), the Court suggested that it would be good defense strategy to put the recantation and the subsequent explanation before the jury as well.  Even after thinking about the matter overnight, trial counsel argued that she wanted this "hearsay" testimony excluded.  See 3/22/00 Tr. at 1487-88.  In Marquez I, the Court held that this

was not a legitimate strategic decision on any theory but a serious blunder that had devastating and foreseeable consequences.  See Marquez I at 23-30.

On direct examination, Mr. Soto Canales also testified that he actually did not hear Mr. Marquez say anything on the street outside of the pool hall.  See 3/21/00 Tr. at 1416.  At the end of the direct examination, and outside the presence of the jury, the Court's Spanish interpreter clarified an earlier statement made by Mr. Soto-Canales that suggested he might have heard Mr. Marquez and Mr. Alberto discuss drugs outside the pool hall.[5]  The Court had initially excluded that statement as hearsay, but in light of the interpreter's clarification, the Court ruled that after counsel completed her cross-examination, the prosecutor could voir dire the witness outside the presence of the jury to establish a foundation for admitting it.  See Marquez I at 19-22.  But defense counsel's subsequent ill-considered cross-examination of Mr. Soto Canales made the voir dire unnecessary.

Before Mr. Marquez's counsel began her cross-examination, Mr. Soto Canales had given three inconsistent statements concerning his knowledge of the alleged drug exchange between Mr. Marquez and Mr. Alberto.  In his grand jury testimony, he indicated that he *saw* a drug transaction between Mr. Marquez and Henry Alberto in the apartment.  At trial, on direct examination, he recanted this testimony and instead said only that Henri Alberto had *told him* of a drug transaction that had taken place in the apartment.  Later, according to a clarification made by the Court's Spanish interpreter, Mr. Soto Canales then made a vague statement, not yet before the jury, that suggested he might have *heard* Mr. Marquez and Mr. Alberto discuss drugs on the street outside the pool hall.  See Marquez I at 21-22.  Although the record after direct

---

[5]        Mr. Soto Canales testified in Spanish at the trial.

examination reflected that Mr. Soto Canales had not heard anything on the street outside the pool

hall, during her cross-examination defense counsel asked a question that allowed Mr. Soto

Canales to contradict his earlier testimony and to testify before the jury that he personally heard

Mr. Marquez ask Mr. Alberto for drugs.

Defense counsel first asked Mr. Soto Canales whether he had *seen* Mr. Marquez

and Mr. Alberto exchange drugs.  In response to her question, Mr. Soto Canales answered: "I

never did, but they spoke."  See 3/22/00 Tr. at 1505.  Counsel attempted to cut him off.  Id.

("My question requires a yes or no answer.").  Yet, counsel's very next question was whether Mr.

Soto Canales had ever *heard* Mr. Marquez and Mr. Alberto discuss drugs.  Id.  And the answer of

course was, "Yes, I heard."  See id.  This was a question no competent counsel would have asked

in view of the discussion with the interpreter outside the presence of the jury.  And it opened the

door to even more damaging testimony on redirect, when the government was able to establish a

clear link between Mr. Marquez's statement on the street and the statement in the apartment.  See

Marquez I at 23.

### B. Cross-Examination of Government Witness Jesus Ismael Medina-Torres[6]

Ismael Medina-Torres was the only other government witness to testify about

Mr. Marquez.  On direct examination, Mr. Medina-Torres's testimony consisted of two

damaging statements: (1) that Mr. Marquez had accompanied Mr. Agramonte to Mr. Medina

Torres's house to collect a drug debt but that Mr. Marquez stayed by the car and they never

spoke; and (2) that Mr. Marquez had offered to sell Mr. Medina-Torres 62 grams of powder

---

[6]        The Court's earlier Opinion discusses in some detail the cross-examination of Mr.
Medina-Torres.  See Marquez I at 30-40.

13

cocaine that belonged to Henri Alberto, but that no actual sale ever occurred.  See 4/4/00 Tr. at

2317-20, 2345-47; Marquez I at 30-31.  No other witness or evidence corroborated Mr. Medina-

Torres's testimony.  Defense counsel's strategy, she later explained, was to attack his credibility,

his primary vulnerability.  See 7/25/07 Tr. at 19.[7]  Indeed, counsel began her cross-examination

by establishing Mr. Medina-Torres's motivation to lie and curry favor with the government.  See

id. at 98-99; Marquez I at 31-32.[8]

Then, in an attempt to attack the veracity of Mr. Medina-Torres's testimony about

Mr. Marquez's offer to sell him 62 grams of cocaine, defense counsel introduced for the first

time information about Mr. Medina-Torres's debriefings with the FBI.[9]  She attempted to

establish that Mr. Medina-Torres never mentioned Mr. Marquez's alleged 62 gram offer to the

FBI during his numerous debriefings with FBI agents, and that his testimony was a recent

---

[7]     The transcript of the July 25, 2007 evidentiary hearing after remand will be referred to by the date of the hearing, abbreviated 7/25/07, and the page with the abbreviation "Tr."

[8]     Mr. Marquez's counsel first highlighted the fact that during the time Mr. Medina-Torres worked with the FBI as an informer, he was actively selling drugs.  See 4/4/00 Tr. at 2375-78.  Defense counsel was able not only to demonstrate that the witness concealed his drug-dealing activities from his FBI contacts but also to elicit an admission from the witness that he had lied to the FBI about these activities.  See id. at 2377.  Defense counsel's cross-examination also revealed that the witness worked as a pimp in brothels in the District of Columbia and in Maryland and that, in connection with these activities, Mr. Medina-Torres had bribed police officers.  See id. at 2369-70.  Finally, she made it clear to the jury that the witness was testifying pursuant to a plea agreement in which cooperation with the government would likely reduce his own sentence quite substantially.  See id. at 2381-82. In these portions of her cross-examination, defense counsel was able to demonstrate that the witness was unreliable and untruthful and willing to say what the government wanted to hear in order to benefit himself -- effective representation of her client.  She should have been stopped there.

[9]     The government never mentioned the FBI debriefings -- or debriefings with the DEA -- in its opening statement or during its direct examination of Mr. Medina-Torres.  See 7/25/07 Tr. at 101.

fabrication motivated by Mr. Medina-Torres' desire to curry favor with the government after his

arrest.  In response to her questions, Mr. Medina-Torres confirmed that he never told the FBI

agent about Mr. Marquez's offer to sell him drugs.  He did testify, however, that he had

mentioned to the FBI someone with Mr. Marquez's nickname "El Chino."  See 4/4/00 Tr. at

2397.[10]

      Defense counsel then inquired about two specific dates -- March 8 and March 18,

1999 -- on which she suggested that Mr. Medina-Torres was debriefed by FBI agents.   Because

defense counsel had mentioned the specific dates of March 8 and March 18, 1999, the Court

permitted the prosecution to clarify on redirect examination that those debriefings were with

*DEA agents*, and not with the FBI.  And because defense had opened the door to a discussion of

debriefings on March 8 and March 18, the Court also permitted the prosecution to explore the

very damaging details of those two DEA debriefings.  Had defense counsel not broadened the

---

[10]      Why she asked the following questions in view of the content of the FBI
memoranda memorializing the FBI's interviews of Mr. Medina Torres (the FBI 302's) is also
unfathomable:

[Q]: And you never mentioned Jose Marquez to Agent McGinty, did you?

[A]: Well, I knew him not by his name but by El Chino.

[Q]: My question was you never mentioned him to Agent McGinty, did you?

[A]: Yes.  I mentioned him.

          *   *   *

[Q]: But you did not mention Chino to Agent McGinty, did you?

[A]: Correct.  I did mention him.

4/4/00 Tr. at 2379.

inquiry to include these DEA debriefings (in addition to the FBI debriefings), the prosecutor would have been precluded from asking about them on redirect, as any such inquiry would have been beyond the scope of cross-examination.

On redirect, however, the government established three incriminating facts: (1) Mr. Medina-Torres had told the DEA agents (not the FBI) about Mr. Marquez's offer to sell him 62 grams of cocaine and that the cocaine belonged to a leader of the conspiracy, Henri Alberto, see 4/5/00 Tr. at 2472-73, 2478-80; (2) at the March 18 debriefing with the DEA, Mr. Medina-Torres viewed a photo spread containing Mr. Marquez's picture and identified him as "El Chino," see id. at 2467-72; and (3) the person Mr. Medina-Torres identified as "El Chino" to the FBI agent and in the DEA photo spread and the person with whom he discussed the purchase of 62 grams of cocaine was in fact the defendant, Mr. Marquez.  See id. at 2472, 2479-80.  Thus, while intending to limit the scope of her questioning to debriefings with FBI agents, counsel had forgotten or overlooked the material she had received in pre-trial discovery and under the Jencks Act -- including FBI 302's and DEA-6's[11] -- and inadvertently referred to two DEA debriefing sessions -- to the great detriment of her client.  See Marquez I at 37-38 & n.9.[12]

---

[11]	A DEA-6 is the investigation report form used by the Drug Enforcement Administration to describe the details of an ongoing DEA case and to summarize witness interviews.

[12]	Defense counsel's questions on cross-examination also opened the door for the prosecutor to call as a rebuttal witness a law enforcement officer who corroborated the otherwise easily discredited testimony of Mr. Medina-Torres.  See Marquez I at 34-36.

### III. THE EVIDENTIARY HEARING

On July 25, 2007, the Court held an evidentiary hearing to determine whether Mr.

Marquez's counsel could offer any reasonable explanation for the decisions she made and the

strategy she employed at Mr. Marquez's trial.  The following briefly summarizes the relevant

testimony.

*A.  Defense Counsel's Strategy Regarding*
*Government Witness Bertilio Jesus Soto Canales*

When asked at the evidentiary hearing about her cross-examination of Mr. Soto

Canales, defense counsel testified that initially she had not planned to spend much time

examining this witness.  See 7/25/07 Tr. at 30.  Counsel made this decision despite the fact that

Mr. Soto Canales was potentially the most damaging witness against Mr. Marquez in view of

Soto Canales's grand jury testimony that he had seen Henri Alberto provide drugs to Mr.

Marquez.  At the evidentiary hearing, when questioned about her failure even to recall this grand

jury testimony, counsel responded that "[a]t that moment [when the testimony was about to come

out] I didn't remember.  But I had read [the grand jury statement], but at that moment I didn't

remember."  7/25/07 Tr. at 61.

At the evidentiary hearing, counsel was questioned about her reasons for objecting

to Mr. Soto Canales's recantation and to letting the jury hear his statement that in fact he had not

seen any drug transaction between Henri Alberto and Mr. Marquez, but had only been told later

by Mr. Alberto that he had given drugs to Mr. Marquez.  She remained unable to appreciate how

helpful this testimony was or to understand the difference between Mr. Soto Canales's damaging

grand jury testimony and his helpful testimony at trial, as the following excerpt from the

evidentiary hearing demonstrates:

> [Q]: And then . . . Judge Friedman asked his own question [at trial], and he said to
> the witness, "you did not personally see Henry [sic] give drugs to Chino
> [Marquez]?" "Answer: No, just what Henry said." Do you remember that?
>
> [A]: Yes
>
> [Q]: So you would agree that . . . this witness is . . . recanting that very damaging
> grand jury testimony; isn't that right?
>
> [A]: He's explaining what his grand jury testimony was, yes.
>
> [Q]: He's explaining, but part of the explanation is, now he's saying, I didn't hear
> it, I didn't see it, correct? . . . . He's limiting the damage . . . . What was your
> strategy for undercutting the grand jury testimony?
>
> [A]: My strategy at the time was that I felt that . . . the testimony that Henry said
> that he had come there to purchase drugs . . . was damaging. And my strategy was
> to have it excluded.
>
> [Q]: Well, let's go back. You agree that the grand jury testimony was very
> damaging, correct?
>
> [A]: Right . . . [t]hat's why I wanted it excluded.
>
> [Q]: Well, you couldn't exclude the grand jury testimony because it came in as
> substantive impeachment evidence.
>
> [A]: Well, I objected to it, and I felt I was trying to get it excluded . . . .
>
> [Q]: But let's get to the point where the Court rules it's coming in, and it gets in
> . . . . Now, as the trial lawyer, what's your strategy at that moment in time for
> undercutting that very damaging testimony?
>
> [A]: My strategy at that point was to try to impeach Mr. Soto Canales with the fact
> that anything that he had said was fabrication.
>
> [Q]: But didn't the recantation that he offered . . . doesn't that impeach his grand
> jury testimony?

[A]: At that time I was thinking that he was explaining his grand jury testimony, and that's equally as damaging as what his grand jury testimony was.

[Q]:  . . . So he, through his recantation . . . in fact he impeached his grand jury testimony?

[A]: Yes.

[Q]: And you objected to that?

[A]: Yes.

7/25/07 Tr. at 69-71.  After thinking about the matter overnight and, for some reason, seeking the advice of counsel for Mr. Marquez's co-defendants, she decided to maintain her hearsay objection.  Id. at 72-73.  In retrospect, she said, "I guess you could say" this strategy was "a mistake."  Id. at 73.

Before Mr. Marquez's counsel began her cross-examination at trial, she should have recognized that Mr. Soto Canales had given three inconsistent statements concerning his knowledge of a drug exchange between Mr. Marquez and Mr. Alberto.  See supra at 9-13. Despite the obvious unreliability of this inconsistent witness, counsel explained at the evidentiary hearing that she asked risky questions because she believed that Mr. Soto Canales would be a reliable and helpful witness.  She made this judgment based on the assurance Mr. Soto Canales's lawyer had given her that his client "did not want to hurt [Mr. Marquez]."  7/25/07 Tr. at 30; see id. at 35.  When asked about this "assurance" at the evidentiary hearing, she attempted to explain:

[Q]:  . . . What tactical purpose does it serve for a lawyer who is getting the heads-up from a witness, I'm about to really hurt your client . . . to continue to examine that witness?

[A]: Well, as I told you, I had thought he had appeared to be earlier—that he wasn't going to harm Mr. Marquez, that he had reneged on what he had originally said, and I thought maybe I could get him back in.

[Q]: So is it your testimony that you continued to cross-examine Soto Canales along these lines because you felt that earlier he was a reliable witness for you?

[A]: Based on that and my conversations with his attorney, I felt that he would . . . come back and not harm Mr. Marquez, that's correct.

[Q]: This is the same witness, Soto Canales, whose [sic] already given three different versions of the events on the street; isn't that right?

[A]: Yes.

7/25/07 Tr. at 77.  Counsel testified that she was "hoping beyond hope that [Mr. Soto Canales] was going to flip on the government and come around to us."  7/25/07 Tr. at 79.

Despite Mr. Soto Canales's grand jury testimony that he saw Mr. Alberto provide drugs to Mr. Marquez, Mr. Marquez's counsel testified that she "felt that that was a safe question to ask, that he hadn't seen them exchange drugs . . . because my recollection was that he hadn't seen any exchange."  7/25/07 Tr. at 34.  After then trying to limit Mr. Soto Canales's testimony to what he had seen, not what he had heard, defense counsel herself then asked what he had heard because she was "again hoping that he was going to come back around, but he didn't."  Id. at 34-35.  She testified that she was surprised by any testimony from Mr. Soto Canales that inculpated her client because Soto Canales's attorney had assured her that Soto Canales "had intended not to harm Mr. Marquez, " id. at 35, and also presumably because at the time she asked these questions she had totally forgotten what Mr. Soto Canales had said in his grand jury testimony (assuming she had even read the relevant portions of the grand jury transcript).  See supra at 10, 17; 3/21/00 Tr. at 1413-15.

20

### B.  Defense Counsel's Strategy Regarding
### Government Witness Jesus Ismael Medina-Torres

In her testimony at the evidentiary hearing, defense counsel acknowledged having

read the DEA and FBI debriefings of Mr. Medina-Torres (the FBI 302's and the DEA-6's) before

she cross-examined him.  See 7/25/07 Tr. at 39, 100-01.  She testified that before she began her

cross-examination she knew Mr. Medina-Torres had mentioned someone with Mr. Marquez's

nickname, "Chino" or "El Chino," during his debriefings and that Mr. Medina-Torres knew Mr.

Marquez as Chino.  Id. at 94-95.  She also knew that Mr. Medina-Torres had testified on direct

examination that Mr. Marquez had offered to sell him 62 grams of cocaine, but that there was as

yet no corroboration of this testimony by this vulnerable witness.  See supra at 13-14.  She

nevertheless proceeded to cross-examine Mr. Medina-Torres as outlined earlier and opened the

door to testimony about his debriefings with the DEA.  See supra at 14-16.  She explained her

"strategy" for cross-examination of Medina Torres as follows:

> [Q]: Now, you had in your possession the DEA debriefings of March 8, 1999, and
> March 18, 1999, before you started your cross-examination of Medina-Torres,
> correct?
>
> [A]: Yes.
>
> [Q]: And you had read them?
>
> [A]: Yes.
>
> [Q]: And you knew the content of the DEA-6s, didn't you?
>
> [A]: Yes.
>
> [Q]: And these [DEA] debriefings were not mentioned by the government at any
> time prior to your cross-examination; isn't that right?
>
> [A]: I don't recall at this time whether they were or not.

[Q]: You don't recall in the opening statement that the government ever said it happened, correct?

[A]: I don't recall.

[Q]: And do you have any recollection of the government eliciting that information on direct examination?

[A]: Are you saying that the government never mentioned the debriefings with the DEA? . . . probably not.

                    *   *   *

[Q]: Now to the DEA, you brought out that he met with them on March 8, 1999, correct? . . .

[A]: Yes, that [Mr. Medina-Torres] met with them.

[Q]: Now, before you mentioned his meeting on March 8, 1999, there was no mention of that meeting, correct?

[A]: I don't recall exactly what's in the record, but if that's what the record reflects, then – . . . .

[Q]: Okay, do you recall the content of the March 8th DEA-6?

[A]: I believe that he identified the individuals that were involved with the conspiracy. He identified some of them by name. He identified Mr. Jose Marquez.

                    *   *   *

[Q]: One of the comments in the March 8, 1999 DEA-6 is . . . Medina identified Jose Marquez as someone that works for [Henri Alberto] and would sell powder cocaine . . . . After you inquired about Medina-Torres's comments, and after you confronted him and said you [Medina-Torres] never mentioned the 62 grams, you know ultimately that led the Court to conclude that you opened the door, so that on redirect the government could address those very comments, correct?

[A]: My question specifically was that he never mentioned the 62 grams to the, I believe to the FBI. . . .   I don't recall whether I included the DEA in my question.

[Q]: I'll . . . ask [the question] again. You're aware that after you confronted Medina-Torres on cross and said you never mentioned the sale of 62 grams of

powder in the debriefings, you're aware that when you concluded your cross-
examination the government argued to the Court that that question opened the
door to their being allowed to get back into the substance of the DEA-6, and the
Court said that is legitimate and fair redirect?

[A]: Yes.

*   *   *

[Q]: And so your strategy of trying to keep Mr. Marquez separated from [Mr.
Agramonte] in a criminal context was negated by your tactic in trying to go after
this witness about not telling the DEA or FBI about drug sales?

[A]: Well, not drugs sales in general.  The specific sale of the 62 grams was what I
had questioned him about.

7/25/07 Tr. at 100-06.

        Defense counsel also failed to appreciate that she already had sufficiently attacked

Mr. Medina-Torres's credibility (see supra at 14 n.8) before inquiring about the FBI debriefings

and then, perhaps inadvertently, eliciting testimony about the March 8 and March 18 DEA

debriefings.  And she failed to understand that by injecting these debriefings into the trial, she

enabled the government to enhance Mr. Medina-Torres's credibility on redirect.  She attempted

to explain:

[Q]: Didn't you realize that if you confronted this witness as you did, that he
didn't mention specifically one drug sale, didn't you realize that that was going to
open up the door for the government to redirect to come back in and talk about
other drug sales?

[A]: At the time my focus was to try and impeach him . . . and attack his
credibility.  And what the government could have done afterwards I could only
speculate to.

[Q]: Well, but it's more than speculation . . . .  You're a trial lawyer and you know
that when you ask questions of a witness, there are going to be consequences on
the other side, don't you?

23

[A] . . . At that time my objective was to show an inconsistency in . . . what he had told the government . . . previous to him being arrested . . . and what he then changed to when he testified before the grand jury [after being arrested].

[Q]: Didn't your strategy include an analysis that if you tried to show an inconsistency, the government would be allowed to show consistency on redirect?

[A]: I, at this time, cannot remember exactly. I know that my main focus was to do what I said I was going to do, whether -- and how I did a step-by-step analysis I cannot recall at this moment.

[Q]: Do you have any recollection of your thought process in weighing the benefit versus the consequences?

[A]: And I thought that, yeah, thinking about it today, I think that the benefit to show the inconsistency outweighed the consequences.

[Q]: Well, but you say you wanted to show the inconsistencies because you wanted to show that the witness was unreliable, correct?

[A]: Yes.

[Q]: But you had a whole warehouse filled with ammunition to take to the jury to say this man is not reliable, to add one possible piece, whereas the downside could just blow up, which in fact is what happened. Looking back now, wasn't it a mistake to run that risk given the information that you had in your hands?

[A]:  . . . [I]n the moment of -- during trial my strategy was to try and do what I could to undermine his previous statement, and I probable [sic] outweighed it and I chose to do that.  Today there's a lot of things I would have probably done different, and maybe this is one I wouldn't do, I don't know.

7/25/07 Tr. at 106-108.

IV. DISCUSSION

*A. Ineffective Representation Under Strickland*

The defendant argues that his counsel was constitutionally ineffective and that her performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. at 686. Having observed Mr. Marquez's counsel first-hand during trial and having heard counsel's incoherent and often nonexistent explanations for the "strategy" underlying her trial conduct at the evidentiary hearing, the Court remains convinced that the verdict is unreliable and that, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the trial would have been different. See Strickland v. Washington, 466 U.S. at 694; United States v. Williams, 358 F.3d at 962. The combination of her many ill-conceived decisions -- permitting the introduction of extremely damaging testimony against her client that the jury otherwise would not have heard, either through her own cross-examination of Mr. Soto Canales and Mr. Medina-Torres or because she opened the door for damaging testimony on redirect and in rebuttal -- together demonstrate "errors so serious that counsel was not functioning as the 'counsel' granted the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. at 687.

Although review of a defense attorney's performance must be "highly deferential," Strickland v. Washington, 466 U.S. at 689, Strickland does not require the Court to "condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." Moore v. Johnson, 194 F. 3d 586, 604 (5th Cir. 1999). While counsel is to be afforded "wide latitude . . . in making tactical decisions," Strickland v. Washington, 466

25

U.S. at 689, and judges should "defer to true tactical choices," the Sixth Amendment does not

permit courts simply to "baptize" unreasonable or unexplainable decisions "with the rejuvenating

labels of 'tactical' or 'strategic' choices." <u>Profitt v. Waldron</u>, 831 F.2d 1245, 1249 (5th Cir.

1987). The record of this trial, coupled with defense counsel's unsuccessful attempts to explain

her choices at trial, continue to persuade this Court that to characterize her judgments as tactical

or strategic would be a perversion of those terms under <u>Strickland</u>.

        In her repeated objections to Mr. Soto Canales's recantation as hearsay, counsel

relied on a strategy made without carefully reviewing Mr. Soto Canales's grand jury testimony,

which was perhaps the most incriminating evidence against her client. Rather than carefully

reading the grand jury testimony of the witness she was about to cross-examine -- indeed, she

may never have read the crucial page at all (<u>see</u> <u>supra</u> at 10) -- Mr. Marquez's counsel relied on

the assurance she received from Mr. Soto Canales's counsel that his client "did not want to hurt

[Mr. Marquez]." 7/25/07 Tr. at 30. This failure to prepare was unreasonable. And the reasoning

offered by Mr. Marquez's counsel for objecting to the admission of Mr. Soto Canales's

recantation -- her hope of impeaching Mr. Soto Canales and undermining his credibility -- is

incomprehensible. Counsel seemed to hold the conflicting beliefs that Mr. Soto Canales's

recantation served simultaneously to impeach his grand jury testimony and to enhance his

credibility. <u>Compare</u> 7/25/07 Tr. at 71 (Q. "So he, through his recantation . . . in fact he

impeached his grand jury testimony? A. "Yes.") <u>with</u> <u>id</u>. at 72 (Q. "What were the tactical

purposes consistent with your trial strategy that were served by maintaining the objection to the

recantation?" A. "I felt that . . . his explanation rehabilitated his credibility."). A reasonably

competent attorney would have recognized that Mr. Soto Canales's recantation -- and his

explanation that he did not see a drug exchange but only heard about one after the fact -- was helpful to the defense.  Instead, Mr. Marquez's counsel believed that this recantation enhanced the witness' credibility.

Nor did counsel offer any acceptable strategic reason for her ill-conceived questioning of Mr. Soto Canales on cross-examination.  On the few occasions where counsel could recall her strategy, her explanation reflected her unreasonably held belief that Mr. Soto Canales eventually would offer testimony helpful to the defense.  Despite Mr. Soto Canales's inconsistent testimony, Mr. Marquez's counsel persisted in asking questions on cross-examination without knowing how Mr. Soto Canales would answer them.  As she testified at the evidentiary hearing, she continued to believe -- in large part due to her inappropriate reliance on assurances from Mr. Soto Canales's counsel rather than on her own independent judgment -- that Mr. Soto Canales eventually would become a reliable witness for her client.  Reasonably competent defense counsel would not have disregarded all that she knew personally about the state of the record (and the documents she had received in pre-trial discovery), the Federal Rules of Evidence, and the unreliability and vulnerability of a witness like Mr. Soto Canales, who had pled guilty and was awaiting sentencing, because a government-sponsored witness' lawyer told her, in effect, "Don't worry.  He wants to help you, not the government."

Defense counsel's strategy was similarly unreasonable with respect to her examination of Mr. Medina-Torres.  Before inquiring about Mr. Medina-Torres's debriefings with FBI agents, counsel had effectively attacked his credibility as a witness.  In exploring Mr. Medina-Torres's FBI debriefings, counsel took an unreasonable risk without any added benefit to the defense.  Counsel testified that her strategy was to continue attacking Mr. Medina-Torres'

27

credibility with regard to his testimony about the offer to sell 62 grams of narcotics.  She then made an unforgivable error, in not remembering the contents of the debriefing memoranda she had received from the government before trial, and questioning Mr. Medina-Torres about the dates when he was debriefed by the DEA, not by the FBI.  This mistake opened the door for the government to explore the DEA debriefings on redirect and show that Mr. Medina-Torres had indeed identified Mr. Marquez in a photo spread as someone who sold cocaine for the alleged conspiracy and that he (Medina-Torres) had mentioned Mr. Marquez's 62-gram offer to law enforcement, thereby bolstering and offering corroboration for his previously suspect testimony.

The government had an uphill battle to convict Mr. Marquez on the charged conspiracy.  Under the circumstances, the best and most prudent strategy for Mr. Marquez's trial lawyer was to keep a low profile and try to minimize the impact of the limited amount of inculpatory testimony directed toward her client.  Anytime she raised an objection or asked a question on cross-examination, the circumstances demanded that she exercise great care and restraint to prevent the government from introducing additional evidence to strengthen a weak case.  Instead, defense counsel made decisions and stumbled into situations throughout the trial that courted disaster and clearly fell outside the range of professional competence that the Constitution demands.  As first explained by this Court in Marquez I, and as her testimony at the evidentiary hearing only seemed to underscore, defense counsel's failings were not the result of reasonable strategic decisions.  They were the result of her lack of foresight, her failure adequately to prepare, and insufficient skill and the necessary judgment to consider the likely impact of her actions.  She raised objections and asked questions without thinking about the potentially damaging consequences, ignored the helpful comments of the Court, and failed to

28

take the basic step of reviewing pre-trial discovery and <u>Jencks</u> material turned over by the government.  The Court need not determine whether each of counsel's errors alone fell outside the range of professional competence, for under <u>Strickland</u>, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  <u>Strickland v. Washington</u>, 466 U.S. at 688; <u>see also</u> <u>Lindstadt v. Keane</u>, 239 F.3d at 202; <u>Henry v. Scully</u>, 78 F.3d at 53.  It plainly was not.

### B.  Prejudice

In a trial lasting two months with 42 government witnesses and the vast majority of government evidence centered on co-defendants Agramonte and Diplan, the government's conspiracy case against Mr. Marquez rested on the testimony of only two witnesses with limited knowledge and questionable credibility.  Before defense counsel came to its aid, the government's direct examination of these witnesses produced at best a thin case against Mr. Marquez.  But then Mr. Marquez's *own lawyer* altered the landscape, allowing the government to present additional and more damaging evidence against her client and to effectively rehabilitate the credibility of the two witnesses against him.  When Mr. Marquez's counsel completed her cross-examination of Mr. Medina Torres and Mr. Soto Canales, the testimony of these two witnesses had been expanded and clarified, and their credibility enhanced.  In this conspiracy case of "underwhelming evidence" against Mr. Marquez, the Court finds that "all of the evidence against [him[ was affected by his counsel's failures; and but for those failures, the prosecutor's case quite likely would have collapsed altogether."  <u>Lindstadt v. Keane</u>, 239 F.3d at 205.[13]

---

[13]     At the end of the government's direct examination, the trial record reflected that Mr. Soto Canales had not seen or heard a drug exchange between Mr. Marquez and Mr. Alberto. The government argues that the testimony elicited by counsel on cross-examination that Mr. Soto

Having sat through the eight-week trial and having observed defense counsel's conduct first-hand during trial, the Court had no confidence in the reliability of the verdict and concluded in Marquez I that, but for defense counsel's errors, the outcome of the trial would have been different. The testimony at the evidentiary hearing only made this conclusion more certain.

The government argues that even if this testimony and the other damaging testimony from Mr. Soto Canales detailed in Marquez I was admitted only because of trial counsel's deficient performance, the additional damaging testimony was only minimally harmful to the defendant and therefore was not prejudicial. To the contrary, the Court's recollection of these events, in the overall context of the trial, is that neither of the witnesses who testified against Mr. Marquez were particularly credible. Considering only the testimony provided by Mr. Soto Canales and Mr. Medina-Torres on direct examination, the government's evidence of Mr. Marquez's actions was confusing and incomplete. This conclusion is reflected in the trial transcript. Through her cross-examination, defense counsel elicited damaging testimony that had not been before the jury and inadvertently rehabilitated the credibility of the witnesses.

The government also argues that Mr. Marquez was not prejudiced by counsel's representation of him because there was sufficient evidence for a jury to find him guilty of conspiracy anyway. Aside from the unreliable testimony of Mr. Soto Canales and Mr. Medina-Torres, however, there were few additional government witnesses who even *mentioned* Mr.

---

Canales did in fact hear the exchange would have come out anyway through the *voir dire* that the Court had permitted after the interpreter's clarification and then before the jury. See Government Findings at 38. Given his inconsistent testimony, however, it is impossible to know how Mr. Soto Canales would have testified during the voir dire. With such an unreliable witness, it is probable that had Mr. Marquez's counsel not opened the door on cross-examination, the final trial record would have reflected that Mr. Soto Canales had only been *told* of the drug exchange, and had not seen or heard it.

Marquez, and those who did provided limited information about peripheral events.  Roger

Ramirez testified that he heard Mr. Agramonte use the name "Chino" while talking on the phone

outside the pool hall on February 4, 1999.  See Government Findings at 9.  Miguel Romero

testified that Mr. Agramonte took Mr. Marquez to get a haircut on February 4, 1999.  See id. at

13.  The government also presented evidence of a number of phone calls between Mr. Agramonte

and Mr. Marquez on February 4, 1999.  See id. at 14.  The building manager of Mr. Alberto's

apartment, which was used as the stash house, testified that Mr. Marquez had come to the

apartment building with Mr. Agramonte, who wanted a key to the apartment.  See id. at 13-14.

This additional evidence does not show beyond a reasonable doubt that Mr. Marquez participated

in a drug conspiracy, only that he knew some of the conspirators.  And even considering the

testimony *on direct examination* from Mr. Soto Canales and Mr. Medina-Torres, the Court

concludes that without the unreasonable conduct of his lawyer there is a reasonable probability

that the jury would have acquitted Mr. Marquez.

        The Court is forced to conclude that had Mr. Marquez proceeded at trial without

any legal representation -- no one to object to questions asked by the prosecutors and no one to

cross-examine government witnesses -- he would have stood a better chance of acquittal.  This

case solidly meets the Strickland standard, for there is a reasonable probability that with the

government's evidence alone, a jury that acquitted Mr. Marquez of the two substantive counts of

unlawful possession with intent to distribute also would have doubted his involvement in the

alleged conspiracy.  Counsel's actions in this case were not those of a reasonably competent

attorney, but rather of a lawyer who failed to prepare, think through arguments, and consider how

her questions and objections might harm her client.  Her conduct influenced all of the evidence

against her client and directly led to her client's conviction.  See Strickland v. Washington, 466

U.S. at 694-95 (her errors "had a pervasive effect on the inferences to be drawn from the

evidence, altering the entire evidentiary picture").  For these reasons, the Court concludes that

Mr. Marquez is entitled to a new trial.

        An Order consistent with this Opinion will issue this same day.


        /s/_____
        PAUL L. FRIEDMAN
        United States District Judge

DATE:  August 28, 2009